Filed 6/23/14  P. v. Martinez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B248226 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA095454) |
| v. | |
| LORRAINE MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert Martinez, Judge. Affirmed with modifications.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Johnathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

After taking her friend's car without his permission, defendant Loraine Martinez drove excessively fast causing a fatal collision. She challenges her convictions for unlawfully taking a vehicle and three counts of second degree murder. We affirm.

## FACTS AND PROCEDURE

It was undisputed that on August 1, 2011, Martinez took Lionel Gudino's Infinity G27 without his permission and drove for an hour or two. Shortly after she sped up to 130 miles per hour, she collided with a Nissan Maxima driven by Miguel Herrera as Herrera was turning left into a business establishment.[1] Herrera's passenger, Desiree Grajeda, was 21 weeks pregnant. The speed limit at the site of the collision was 35 miles per hour.

Officer Daniel Gomez arrived at the scene shortly after the collision and observed Herrera "crushed. . . . [H]is eyes were open, his tongue was sticking out, and the flames were actually on him and he wasn't screaming." The Maxima broke into two pieces and exploded. Seventy-five percent of Herrera's body was burnt; and he suffered injuries to numerous organs, and fractures to his skull, spinal cord, and a rib. Eighty percent of Grajeda's body was burnt; and she suffered numerous injuries including injuries to her liver, lung, spleen and aorta. Grajeda's fetus suffered a liver injury and died of traumatic fetal demise.

Immediately after the collision, defendant fled. Officer Angela Torres spotted her attempting to jump over a wall. Defendant had bruising on her left shoulder and diagonally across her body. Torres recovered a folding knife from defendant's waist. Torres asked defendant questions and she answered coherently, though she did repeat herself.

It was undisputed that defendant was driving 130 miles per hour and that speed was recorded in the Infinity's event data recorder. The Infinity's event data recorder marked defendant's speed seven seconds prior to the collision at 97 miles per hour.

---

[1] A Pomona police officer opined that Herrera was making an illegal left turn, but later corrected his testimony, concluding that the turn was proper.

Officer Michael Vendenberg opined that the collision was caused by a red light violation with speed as an associated factor. Photographs introduced in evidence showed that the Maxima split in half. Jurors were shown the Maxima and the Infiniti during trial. Defendant did not have a driver's license on August 1, 2011. Although Officer Torres believed she smelled alcohol on defendant's breath immediately after the collision, defendant's blood showed no presence of alcohol about an hour and a half after the collision.

Dr. Haig Kojian, a forensic psychologist, testified for the defense. In February 2011, defendant was hospitalized in a mental health psychiatric facility. Defendant was diagnosed as being psychotic and displayed the following symptoms: mania, irritability, mood fluctuations, mood instability, pressured speech, racing thoughts, grandiosity, psychomotor agitation, insomnia, hyperreligiosity, hypersexuality, paranoia, and disorganized speech. Defendant scored very low on a test that measured her level of functioning. At that time, there was clear evidence defendant had "decompensated." Kojian defined "decompensation" as when an individual becomes "psychotic, delusional, irrational, and mentally ill." Decompensation may be triggered by medication, drugs, stress, or bad news. Defendant stabilized after taking medications.

On July 27, 2011, defendant was brought to Pomona Valley Medical Center. Records indicated that she was told to follow up with her primary medical doctor. On July 27, defendant showed no signs of decompensation.

After the collision and her incarceration, defendant was placed on a hold pursuant to Welfare and Institutions Code section 5150. While incarcerated, she had been smiling and talking to herself, standing naked in her cell, leaving food on the floor, and leaving the toilet in an unsanitary condition. She flooded her cell with water, responded to people who were not present and claimed to be 10 months pregnant. She complained of hearing voices. Defendant was treated with medication and her symptoms subsided. Kojian opined that the collision could have triggered defendant's decompensation. At the time of trial defendant's mental disorder was in remission.

3

Defense counsel's closing argument focused on defendant's mental health. Counsel asked whether Martinez knew what the vehicle "was capable of doing." Counsel argued that defendant suffered from severe bipolar disorder with psychotic features. Counsel emphasized that defendant was institutionalized six months before the accident resulting in this case.

Counsel argued: "I don't know if the People are expecting me to argue that she had fully decompensated at the time of the accident because that's not my argument either. If she had fully decompensated, I don't know if she'd be able to drive that vehicle in a straight line or get behind and completely get it going; right? It's not the argument that she had fully decompensated because she wouldn't be able to carry on any kind of conversation with the officers at the time." Counsel further argued that the event that led to defendant's decompensation occurred "just three or four days before [the accident]. She was arrested on that day. She's brought into the facility. They don't give her psyche meds." "What is it that drives her to drive like that? Could it be her very psychosis? The action itself of driving a car that fast—consider that in determining her mental state."

Jurors convicted defendant of three counts of murder and one count of unlawfully taking a vehicle. Defendant was sentenced to a total prison term of 47-years-to-life, comprised of three consecutive 15-year-to-life terms for the three murder counts and a two-year term for unlawfully taking a vehicle.

## DISCUSSION

### 1. Sufficiency of the Evidence

Defendant argues there was insufficient evidence of implied-malice murder to sustain the three murder convictions. She argues this case involves only a single, isolated moment of reckless driving. We disagree.

"Second degree murder is the unlawful killing of a human being with malice aforethought, but without the additional elements that it be willful, deliberate and premeditated, which are required for first degree murder. [Citations.] Malice may be implied when a person does ""''an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows his conduct

4

endangers the life of another and who acts with conscious disregard for life.""'"' [Citations.] [¶] Implied malice is determined by examining the defendant's subjective mental state to see if he or she actually appreciated the risk of his or her actions. [Citations.] Malice may be found even if the act results in a death that is accidental. [Citation.] It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence. [Citation.]" (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697.)

In *People v. Moore* (2010) 187 Cal.App.4th 937 (*Moore*), the appellate court applied these principles in a case similar to the present one. The court upheld a murder conviction based on evidence the defendant drove at excessive speeds even though the defendant was not under the influence of alcohol. (*Id*. at p. 939.) In *Moore*, the defendant drove approximately 80 or 90 miles per hour on a street with a 35-mile-per-hour speed limit. (*Id*. at p. 939.) The defendant was unable to stop for a traffic signal and struck another vehicle. (*Ibid*.) After the collision, the defendant fled the scene. (*Id*. at p. 940.) When police tried to stop the defendant, he continued to drive about 40 to 45 miles per hour in a 25-mile-per-hour zone. (*Ibid*.)

The court found the following evidence sufficient to show that the defendant had a subjective awareness of the risk: "Here Moore drove 70 miles per hour in a 35-mile-per-hour zone, crossed into the opposing traffic lane, caused oncoming drivers to avoid him, ran a red light and struck a car in the intersection without even attempting to apply his brakes. His actions went well beyond gross negligence. He acted with wanton disregard of the near certainty that someone would be killed." (*Moore, supra*, 187 Cal.App.4th at p. 941.) "Whether Moore was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, Moore was aware of the risk." (*Ibid*.)

As in *Moore*, the evidence here was sufficient to support defendant's second degree murder conviction. Defendant drove 130 miles per hour, almost four times the posted speed limit and almost twice as fast as the defendant in *Moore*. She was on a

street with traffic signals and did not stop for the traffic signal. Evidence that defendant braked just before the incident indicated she was aware of the risk of her driving. Evidence that she fled the scene afterwards shows a consciousness of guilt. The fact that the collision occurred within seconds of defendant's increased speed distinguishes this case from *Moore*, but does not require the conclusion defendant lacked consciousness of the risk posed by her excessive speed.

Finally, defendant's argument that other cases involve more egregious conduct such as driving under the influence of alcohol or drag racing does not show that there was insufficient evidence in this case. The critical question was whether defendant appreciated the risk of her actions, and as we have explained the record supports the jurors' conclusion that she did. Moreover, a high speed chase or drug impaired driving is not necessary to classify a vehicular homicide as murder. (*People v. Contreras* (1994) 26 Cal.App.4th 944, 955.)

## 2. Alleged Instructional Error

Defendant challenges the court's instruction on implied malice, the court's refusal to give an instruction on vehicular homicide, and the court's instruction defining a fetus. None of her challenges warrant reversing her convictions.

### a. Instruction on Intentional Act

Defendant challenges the jury instruction on implied malice, arguing that jurors should have been instructed the intentional act was driving a motor vehicle at a high rate of speed rather than simply operating a motor vehicle. Additional background is necessary to analyze defendant's argument.

### i. Background

Jurors were instructed as follows:

"The defendant acted with implied malice if:

"1. She intentionally committed *an act*;

"2. The natural and probable consequences of the act were dangerous to human life;

"3. At the time she acted, she knew her act was dangerous to human life;

6

"AND

"4. She deliberately acted with conscious disregard for human or fetal life."
(Italics added.)

Jurors asked the following: "Under Implied malice the statement 'She intentionally committed an act' does the 'act' mean the murder or the speed of the vehicle in this case?"

The court responded: "The 'Act' refers to the operation of the motor vehicle." The court subsequently elaborated as follows: "That note earlier that you sent me related to one of the elements of implied malice, that being item No. 1 that reads she intentionally committed an act, and your question asked was that act the murder or the speed of the vehicle. [¶] When I responded that the act related to the operation of the motor vehicle, I don't want you to go away thinking that I've decided that. Because that's your issue. What my comment was, and I have confirmed with the attorneys, is that the prosecution is relying on the operation of the motor vehicle as the intentional act. Okay? [¶] So, again, I'm not telling you that, yes, in fact it was an intentional act. That's not my job. You decide that. But, from the prosecution point, that is the act, the operation of the motor vehicle, that they are relying on as far as element No. 1 of implied malice."

ii. Analysis

Defendant argues the court should have instructed jurors that "the act" meant driving at a high rate of speed, and the court's failure to do so allowed jurors to find implied malice without finding that she intended to speed. According to defendant, "the court relieved the jury of its obligation to find that the specific act (manner or circumstances while driving) that caused the homicide was intentional." Defendant claims that her speeding could have been "the involuntary effect of the sudden onset of a psychotic episode."

We agree with defendant that a jury theoretically could find someone in defendant's position could have intentionally operated the vehicle without finding she intentionally sped. By defining the act as operating the vehicle, jurors were asked to

7

determine that defendant intentionally operated the vehicle. They were not asked specifically to determine that defendant intentionally sped.

But defendant's theory that she intentionally operated the vehicle and then involuntarily sped because of a psychotic episode is not supported by any evidence in the record (and is raised for the first time on appeal). At trial, defense counsel argued that defendant began decompensating on July 27, not in the time between taking Gudino's car and driving it to excessive speeds. More significantly, no evidence supported the theory that defendant intentionally drove the Infinity but did not intentionally speed. No evidence showed defendant's speeding to 130 miles per hour was the result of decompensation. Kojian acknowledged that the evidence on July 27 showed defendant had not decompensated, and no evidence showed such decompensation occurred prior to her incarceration. Therefore, assuming the court should have more narrowly defined the act as defendant argues, she cannot demonstrate any prejudice from the presumed error.

Moreover, as respondent points out when the instruction is considered in its entirety, jurors necessarily found that defendant knew her driving was dangerous to human life. Specifically to convict her of implied-malice murder, jurors were required to find that "[a]t the time she acted, she knew her act was dangerous to human life." To reach that conclusion they must have found that her excessively fast driving was dangerous to human life. Jurors also were required to find defendant acted with conscious disregard for human or fetal life. Conscious disregard means "'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.'" (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.) Thus jurors determined that defendant knew her driving was dangerous. In the context of this case she must have known that her speed was dangerous and any presumed error in broadly defining the act was necessarily harmless.

Defendant's related arguments lack merit. The court did not create a mandatory presumption like in *People v. Vanegas* (2004) 115 Cal.App.4th 592 in which the court instructed jurors that a violation of the "basic speed law" is inherently dangerous to human life. (*Id.* at pp. 599-600.) "An instruction which requires the jury to find an

elemental fact (dangerousness to human life) upon proof of a predicate fact (violation of the basic speed law) would be unconstitutional because '[s]uch directions subvert the presumption of innocence accorded to accused person and also invade the truth-finding task assigned solely to juries in criminal cases.'" (*Id*. at p. 599.) No similar instruction was given in this case.

*b. Instruction on Vehicular Manslaughter*

Defendant argues that the trial court was required to instruct on vehicular manslaughter because it is a lesser included offense of murder. Instructions on lesser included offenses must be given whenever there is evidence the defendant committed the lesser crime. (*People v. Birks* (1998) 19 Cal.4th 108, 112.) Here, even if vehiclular manslaughter were a lesser included offense to murder there is no substantial evidence that defendant acted with the mental state required only of manslaughter and not of murder.

*c. Definition of Fetus*

Jurors were instructed as follows: "A fetus is an unborn human being that has progressed beyond the embryonic stage after major structures have been outlined, which occurs at seven to eight weeks of development." Defendant argues that the instruction was improper because it removed from jurors the question of whether Grajeda's embryo had become a fetus.

Defendant's challenge to the instruction lacks merit as the language in the instruction follows exactly our high court's definition of a fetus. *People v. Davis* (1994) 7 Cal.4th 797, 810 (*Davis*) instructed that a "fetus is defined as 'the unborn offspring in the postembryonic period, after major structures have been outlined.' [Citation.] This period occurs in humans 'seven or eight weeks after fertilization.'" (*Ibid*.) In *People v. Taylor* (2004) 32 Cal.4th 863, 867, our high court explained: "'[V]iability is not an element of fetal homicide . . .' but the state must demonstrate 'that the fetus has progressed beyond the embryonic stage of seven to eight weeks.'"

Even assuming the court erred in instructing jurors that major structures have been outlined in seven or eight weeks, the error was harmless beyond a reasonable doubt. It

9

was undisputed that the fetus was approximately 21 weeks, well beyond the seven or eight weeks period identified in *Davis*. Additionally, the deputy coroner testified that but for the injuries suffered in the collision, the fetus was viable. A viable fetus is one that can survive outside the womb (*Davis, supra*, 7 Cal.4th at p. 801); and, therefore, to be viable a fetus necessarily progressed beyond the development of major structures. No evidence contradicted the deputy coroner's testimony that the fetus was viable.

### 3. Alleged Evidentiary Errors

Defendant fails to show reversal is warranted based on alleged evidentiary errors. She claims that the court improperly excluded evidence that Gudino assaulted her before she took his car and that the court improperly allowed jurors to view the vehicles.

### a. Exclusion of Evidence Defendant Was Assaulted

In a pretrial hearing, Officer Torres testified that defendant told her she took the knife she was carrying from her boyfriend after she got in a fight with him. Defendant also said that is the reason she fled. Defendant argues the evidence should have been admitted as a spontaneous statement.

Assuming the court erred in excluding the evidence, the error was not prejudicial. There was no evidence that the assault—if it occurred—actually triggered defendant to decompensate. Even defense counsel argued that defendant had not fully decompensated at the time she took the vehicle. Moreover there was no evidence that defendant had suffered a psychotic episode prior to the collision. She was coherent when she spoke to Officer Torres. She attempted to flee the scene, indicating an awareness of her actions.

With respect to the unlawful driving a vehicle, defendant argues that the evidence she was assaulted would have offered an explanation for taking the vehicle. Defendant argues that "she panicked after being assaulted, began the terrible process of decompensation, and drove off with the car, without harboring any particular intent, or even thinking about what she was doing." The problem with her argument is that it is not supported by any evidence. There was no evidence she panicked, started to decompensate, or drove off without thinking about her actions.

10

*b. Viewing of the Vehicles*

The prosecutor requested jurors be permitted to view the vehicles in order to determine the speed of defendant's car.  Over objection, the court allowed such viewing.  Evidence Code section 352 requires the exclusion of evidence "'when its probative value is *substantially* outweighed by its prejudicial effect.'"  (*People v. Jones* (2013) 57 Cal.4th 899, 948.)  "'Evidence is prejudicial within the meaning of Evidence Code section 352 if it "'uniquely tends to evoke an emotional bias against a party as an individual'" [citation] or if it would cause the jury to ""'prejudg[e]" a person or cause on the basis of extraneous factors'" [citation].' [Citation.]"  (*People v. Foster* (2010) 50 Cal.4th 1301, 1331.)

The court erred in allowing the viewing.  First, there was no link between seeing the cars and determining the speed of the cars.  Second, it was undisputed that defendant drove 130 miles per hour.  Evidence conclusively demonstrating that fact was admitted through the Infinty's event data recorder.  Third, numerous photographs of the vehicles were admitted showing the Maxima split in half with the two halves in different locations on the street.  The pictures showed that the Maxima was severely charred and that the front of the Infinity was badly damaged.  Fourth, Officer Gomez testified as to the explosion and how Herrera suffered in the explosion and the deputy coroner described the victims' extensive injuries.  In light of all of this evidence, the viewing of the vehicles was clearly cumulative.  It added nothing to assist jurors in evaluating the Infinity's speed. Viewing the vehicles did not have substantial probative value that outweighed the prejudice of seeing the horrific damage.

The error, however, did not prejudice defendant.  The only real issue at trial was defendant's mental state at the time of the crime.  The cars were not probative of defendant's mental state.  It is not reasonably probable that absent the evidence she

11

would have obtained a more favorable verdict.  (*People v. Alcala* (1992) 4 Cal.4th 742, 791 [evidentiary rulings reviewed for prejudice under reasonable probability standard].)**2**

### 4. Alleged Judicial Misconduct

At the beginning of the case, the court explained the importance of jury service and told jurors that the decisions they make could lead to safer streets.  Specifically the court stated:  "You may not know this but there have been decisions that have been made in this courthouse that have directly impacted your lives.  The areas or the shopping centers where you shop may be safer for you because of decisions that took place in this courthouse. *The roads that you drive to work or to deliver your children to school are safer because of lawsuits that took place in this building that identified dangerous conditions.*  This courthouse has handled matters affecting your neighbors, perhaps your children, your spouses.  If there are issues of family law, they have come to this courthouse."  The court continued extensively explaining the presumption of innocence in a criminal case.

Defendant argues the italicize language was prejudicial error.  Defendant did not object to the comments and therefore forfeited the argument.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 655.)

Even assuming the issue were preserved, we would find no merit in defendant's contention.  The italicized language concerns dangerous conditions, a reference to a civil lawsuit.  It cannot reasonably be understood as a judicial comment on the future of public safety based on the verdict in this case.  Moreover, immediately after uttering the challenged comments, the court extensively explained the presumption of innocence.  The comments occurred before voir dire began ""at a much less critical phase of the proceedings.""  (*People v. Thomas* (2012) 53 Cal.4th 771, 797.)  The court instructed jurors that "[i]t is not my role to tell you what your verdict should be.  Do not take

---

**2**     Defendant's argument that she suffered cumulative prejudice based on the exclusion of the alleged spontaneous statement and the viewing of the vehicles is not persuasive.

12

anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." The record does not support defendant's contention that the court prejudiced jurors by suggesting their verdict would implicate the safety of their neighborhoods.

## 5. *Consecutive Life Terms*

Defendant recognizes that consecutive terms are permissible where a single act of violence causes the death of multiple victims (*People v. Valenzuela* (1995) 40 Cal.App.4th 358, 364-365) but argues imposition of consecutive terms in this case was an abuse of discretion because the consecutive sentences were inconsistent with her culpability. We disagree.

"''"A defendant who commits an act of violence . . . by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person."''" (*People v. Calhoun* (2007) 40 Cal.4th 398, 408.) Applying that reasoning our high court upheld consecutive sentences when the defendant killed two people and injured two others after drag racing at speeds over 70 miles per hour. (*Ibid*.) Here, defendant drove almost twice as fast as the defendant in *Calhoun* and under the reasoning of *Calhoun*, the trial court acted within its discretion when it imposed consecutive sentences.

*People v. Valenzuela, supra*, 40 Cal.App.4th 358 also supports this conclusion. In *Valenzuela* the defendant pled guilty to two counts of gross vehicular manslaughter while intoxicated. Defendant killed two people when he drove 70 miles an hour and ran a red light. (*Id*. at p. 360.) The court held: "Valenzuela's drunk driving resulted in the death of two people, not just one. The trial court should have the discretion to make Valenzuela 'pay' for both deaths." (*Id*. at p. 365.) Similarly here, the trial court had discretion to impose consecutive sentences.

## 6. *Presentence Conduct credit*

Defendant argues and respondent agrees that defendant was entitled to 625 days of actual custody credit. The court should have awarded custody credit from the day defendant was arrested to the day of sentencing. (*People v. Herrera* (2001) 88

13

Cal.App.4th 1353, 1366-1367; *People v. Smith* (1989) 211 Cal.App.3d 523, 526.)  The court erred in awarding her only 259 days.

## DISPOSITION

The judgment is modified to reflect 625 days of presentence custody credits.  In all other respects the judgment is affirmed.


FLIER, J.

I CONCUR:


RUBIN, J.

**BIGELOW, P. J.**

I concur.

I write separately to indicate I find no abuse of discretion in the trial court's decision to allow the jury to view the automobiles involved in this crime. Martinez contends that allowing the jurors to see the cars violated Evidence Code section 352. That section grants the trial court discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." We review such a decision for an abuse of discretion. (*People v. Scott* (2011) 52 Cal.4th 452, 491.)

Trial judges admit guns, knives and other instruments used by defendants to commit murder every day. Here, the victim's death was brought about by Martinez's speeding in a car, which collided with Herrera's car. The car was the murder weapon. By no means did the trial court abuse its discretion when it allowed the jury to view the weapon that caused the victim's death. There is no *undue* prejudice by allowing the jury to see in three dimensions that which was depicted in a photograph in two dimensions.


BIGELOW, P. J.